UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Michael Bennett, Colleen Bennett,
Raymond A. Brogger, Phyllis Brogger,
Cynthia Gurnsey, Michael G. Newago,
Sherri L. Newago, Donald Finn, and
Lois Northbird,

                      Plaintiffs,

                                    Civ. No. 05-38 (RHK/RLE)
                                    **MEMORANDUM OPINION**
                                    **AND ORDER**

v.


International Paper Company,
Burlington Northern and Santa Fe
Railway Company, Dow Chemical
Company, and Monsanto Company,

                      Defendants,

v.


Burlington Northern and Santa Fe
Railway Company,

                      Cross Claimant,


v.


International Paper Company,
Dow Chemical Company,
and Monsanto Company,

                      Cross Defendants.

Gary M. Hazelton and Mark L. Rodgers, Hazelton & Rodgers, PC, Bemidji, MN; James P. Carey and John W. Carey, Sieben Grose Von Holtum & Carey, Ltd, Minneapolis and Fairfax, MN; Wilbur William Fluegel, Fluegel Law Office, Minneapolis, MN; and William J. Delmore, Kelsch Kelsch Ruff & Kranda, Mandan, ND, for Plaintiffs.

Michael S. McDonough, R. Raymond Rothman, and Tiffany R. Hedgpeth, Bingham McCutchen LLP, Los Angeles, CA; and Carolyn V. Wolski, Leonard Street and Deinard, Minneapolis, MN, for Defendant International Paper Company.

Timothy R. Thornton and Timothy G. Gelinske, Briggs and Morgan, PA, Minneapolis, MN, for Defendant Burlington Northern and Santa Fe Railway Company.

Fazal R. Khan and Lise T. Spacapan, Jenner & Block, Chicago, IL; and Sarah L. Brew and Stacy Lynn Bettison, Greene Espel, Minneapolis, MN, for Defendant Dow Chemical Company.

C. Ron Hobbs, II, Jerry K. Ronecker, and Kenneth R. Heineman, Husch and Eppenberger, LLC, Clayton, MO; and George W. Flynn and Robert W. Vaccaro, Flynn Gaskins & Bennett, LLP, Minneapolis, MN, for Defendant Monsanto Company.

## INTRODUCTION

This case involves claims arising from contaminated real property that has been subject to administrative oversight for more than twenty years, and remains subject to agency proceedings at this time. Plaintiffs, who own contaminated land, seek injunctive relief and damages. Defendant International Paper has moved to dismiss or in the alternative stay this action in favor of deferral to the United States Environmental Protection Agency ("EPA") under the doctrine of primary jurisdiction. The other defendants to this action are also in favor of staying the matter pending the outcome of

the on going administrative proceedings. For the reasons that follow, the Court determines that a limited stay of these proceedings is warranted.

## BACKGROUND

The contaminated property at issue is land under and around a former wood treatment plant in Cass Lake, Cass County, Minnesota ("the Site"). Plaintiffs are owners of real property located on the Site. They have alleged eleven causes of action against Defendant International Paper Company ("International Paper"), which operated wood treatment facilities on the Site, Defendant Burlington Northern and Santa Fe Railroad Company ("BNSF"), which owns portions of the Site, and Defendants Dow Chemical Company and Monsanto Company, which Plaintiffs allege manufactured, distributed, and sold chemicals used in the wood treatment operations (collectively "Defendants"). The Site consists of 41 acres along a railroad right of way (owned by BNSF, and leased to International Paper) and an additional parcel of 26 acres south of that land.[1]

---

[1] The ownership of the Site has changed over the years. Initially, the St. Regis Paper Company ("St. Regis") operated its wood treatment operations on land leased from BNSF. Later, St. Regis expanded its operations to include land that it purchased south of BNSF's land. In 1985, Champion International Corporation ("Champion") and St. Regis merged. In 2000, International Paper acquired the stock of Champion. For purposes of this Order, the Court will refer to St. Regis, Champion, and International Paper collectively as "International Paper." After wood treatment operations at the Site ceased, portions of the Site were sold to the Leach Lake Band of Ojibwe and to the City of Cass Lake. The City subsequently sold the land it bought to Cass Forest Products. For purposes of this Motion, however, the Court need not delve into the current ownership interests in the land, as Plaintiffs brought suit only against the owners and lessors of the land at the time wood treatment operations were conducted there.

Plaintiffs seek injunctive relief—specifically, that Defendants be ordered "to ascertain, outline, and define the outer limits of contaminated groundwater and properties . . . ; to remove all hazardous substances, pollutants and contaminants from the groundwater surrounding the wood processing plant, and to clean up, remediate or remove and replace all contaminated property, including Plaintiffs' residences." Plaintiffs also seek to have these cleanup and decontamination activities completed within a "reasonable time, not to exceed 18 months," and to have these activities overseen by the Minnesota Department of Health. (Compl. at 17-18.)

Plaintiffs further seek as damages "such sums as may be required to cover costs incurred for tests and for experts to investigate the environmental damage and required cleanup and remediation and relocation of plaintiffs if necessary or restoration damages." In addition, they seek special damages to compensate them for the diminution in value of their property, inability to sell, mortgage, or improve their properties, and their liability for cleanup of the pollution under their property. (Id.)

**Wood Treatment Operations at the Site.**[2]

The operation of the wood processing plant on the Site involved processing and chemically treating timber to produce wood products, including telephone poles, bridge

---

[2] The information in this section is largely drawn from Plaintiffs' Complaint and, for purposes of this Motion, the Court will assume the facts in Plaintiffs' Complaint are true. The Court also drew from the EPA's "Findings of Fact" set forth in the Unilateral Administrative Order for Human Health and Ecological Risk Assessment ("UAO") issued in August 2004 (the "2004 UAO"). (Rothman Aff. Ex. B.)

members, guardrail posts, and other building construction products. These wood preserving operations began in the 1950s and continued until 1985.

These operations led to the release of hazardous substances into the soil, groundwater, and air. Those substances included dioxin, creosote, pentachlotophenaol, and fuel oil and its by-products. The process also created various waste products, including chemicals that drained from treatment tanks and treated wood, sludge cleaned from treatment cylinders, and wastewater. The wastewater, which was contaminated with various chemicals, was discharged to wastewater disposal ponds on the Site between 1957 and 1971. Those ponds were covered with sand, and replaced by a new wastewater pond which was used for the same purpose until 1980. After 1980, wastewater was either left to evaporate in tanks designed for that purpose, disposed of in a manhole located within the Chippewa National Forest that lead to the City of Cass Lake sewage treatment facility, or reused in the wood treating process. The sludge created from the operations was disposed of at a landfill located on the eastern edge of the Site and in a pit located in the Cass Lake City Dump. That material, along with waste oil, was also periodically burned at the City Dump.

"Waste timber," including treated and untreated wood, was sold by the Cass Lake Plant to residents of the surrounding neighborhood who used the timber, including treated timber, in their homes for cooking fuel and heating. The burning of treated timber caused the creation and release of various noxious and poisonous chemicals, including dioxin, which would then contaminate surrounding homes and yards.

**Agency oversight of the Cass Lake Plant.**[3]

In 1977, International Paper installed groundwater monitoring wells at the Site. Based on the results of that groundwater monitoring, the Minnesota Pollution Control Agency ("MPCA") determined that hazardous substances had been released from the Site. On September 21, 1984, the EPA placed the Site on the National Priorities List ("NPL").[4] In the late 1980s, the MPCA directed International Paper to conduct various cleanup, remedial, and monitoring actions to address the contamination of the Site.

In 1994, the EPA took over as lead agency responsible for overseeing Site activities. In January 1995, the EPA issued a Unilateral Administrative Order ("UAO") to International Paper for continued performance of response, remedial, and long-term oversight and maintenance activities at the Site. In March 1995, the MPCA (on behalf of the EPA) performed a 5-year review of the response actions previously implemented at

---

[3] Unless otherwise indicated, the background of the administrative agency involvement at the Site is largely drawn from the 2004 UAO. (Rothman Aff. Ex. B.) Plaintiffs do not appear to contest the accuracy of the agency involvement at the Site as described in the 2004 UAO. The EPA has represented to the Court that "the facts, as stated [in the parties' court submissions], with regard to the activities of the EPA on the . . . Site are materially accurate." (Letter to the Court from Assistant United States Attorney Joan D. Humes dated May 20, 2005.) The EPA has not taken a position regarding the instant Motion.

[4] The NPL is a list of "known or threatened releases of hazardous substances that are priorities for remedial action, i.e., long-term cleanup activities designed to address the environmental dangers associated with a contaminated site." Honeywell Int'l, Inc. v. Environmental Protection Agency, 372 F.3d 441, 443 (D.C. Cir. 2004) (citation omitted). The federal government is required to compile the NPL under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601-9675. Id.

the Site. That review determined that, until additional soil evaluation was performed, the remedial action could not be determined to be protective. It recommended, in part, that additional soil sampling, surface and groundwater and sediment sampling, and monitoring of the groundwater be conducted. Further steps were recommended if major contamination was discovered.

In September 2000, the EPA performed a second 5-year review. This review again recommended additional soil, groundwater, sediment, and surface water sampling. It also recommended that human health and ecological risk assessments be conducted to determine the protectiveness of the remedial actions performed to that point, and that additional monitoring wells be installed. In October 2001, the EPA and the Leech Lake Band of Ojibwe performed sampling activities to further evaluate issues raised as a result of the 2000 5-year review. Those sampling activities indicated certain levels of various chemicals in the soil, fish tissue, and sediment of the ecosystem of the Site. In July and August 2003, the EPA ordered another round of sampling through a UAO, which International Paper conducted, and which confirmed the results of the 2001 sampling. In December 2003, the EPA issued another UAO citing an actual or threatened release of hazardous substances as a basis for removal action in the northwest storage area of the Site. This UAO required International Paper to excavate and dispose of soils impacted by dioxins, and to perform confirmatory sampling and restoration activities. According to International Paper, the removal work ordered by the December 2003 UAO has been completed, and limited restoration activities remain. (See Mem. in Supp. at 9.)

Currently pending is the 2004 UAO, issued in August 2004, which states that "[t]he actual or threatened release of hazardous substances from the site may present an imminent and substantial endangerment to the public heath, welfare, or the environment . . . and requires the risk assessment described within." (Rothman Aff. Ex. B at 7.) It goes on to state that "a human health and ecological risk assessment is necessary in order to determine, more precisely, the degree to which the 1986 remedy remains protective of human health and/or the environment." (Id.) The 2004 UAO requires International Paper to perform various testing and sampling in conformity with a Work Plan, and to provide progress reports to the EPA on a monthly basis. A major aspect of the 2004 UAO is the requirement that International Paper complete a Human Health and Ecological Risk Assessment Report (the "Risk Assessment Report"), which will evaluate the potential impact Site contaminants could have on people living on or around the Site. The Risk Assessment Work Plan, a detailed document of over 100 pages (not including the references and voluminous tables and appendices attached to it) sets forth the sampling requirements and procedures to be used in conducting the Risk Assessment Report. The draft Risk Assessment Report from International Paper is due on July 29, 2005. (Rothman Aff. Ex. T.)

**Recent Developments.**

Plaintiffs filed the instant action on January 6, 2005. On March 2, 2005, the Minnesota Department of Health ("MDH") wrote a letter to the EPA, expressing its concern regarding the threat posed by continued contamination of residences around the

Site.  (See MDH letter attached to Plaintiffs' Mem. in Opp'n. (the "MDH Letter").)  The MDH Letter references indoor dust sampling conducted in October 2004 by International Paper, which was done "[u]nder an EPA order," showing that six of the ten homes tested had levels of contamination above acceptable levels.  (Id.)  The ten homes were among "approximately 40 residences . . . located within or adjacent to the former manufacturing areas."  (Id.)  The MDH Letter goes on to state that the MDH

> strongly urge[s] [the EPA] to devise a plan to effectively eliminate the on-going exposures to the site contaminants.  While a long-term remedy for the industrial site and impacted residential properties is being developed, immediate intervention in on-going exposures needs to be initiated either through remediation of contamination within the interior of impacted homes or relocation of the residents.

(Id.)

Subsequent to the MDH Letter, International Paper moved to dismiss or stay the proceedings, or to strike Plaintiffs' request for injunctive relief and stay their damages claims in deference to the EPA under the doctrine of primary jurisdiction.[5]  Since filing the instant Motion, International Paper has been involved in further administrative activities: on April 29, 2005, pursuant to the 2004 UAO, International Paper submitted a data report to the EPA (see Reply Mem. at 7); it will also submit the Risk Assessment Report on July 29, 2005, as required by the 2004 UAO (see id.).

The most recent (and possibly most significant) development regarding the EPA's activity at or around the Site occurred after the Court took International Paper's Motion

---

[5]The other defendants support International Paper's Motion.

under advisement.  After the Court heard oral arguments on the instant Motion, the EPA reported that it is proposing specific cleanup activities involving approximately 40 homes near the Site.  (See United States Environmental Protection Agency Site Update, EPA Proposed Plan Tackles House Dust Contamination, May 2005, at http://www.epa.gov/region5/sites/stregisfs200505.pdf (the "May 2005 Site Update").)  The May 2005 Site Update, which is published by the EPA, details the EPA's proposed cleanup of the approximately 40 residences located near the Site as well as the reasoning behind the EPA's decision to propose its plan.[6]  (See id. at 2-4.)

Pursuant to a Court request, Plaintiffs' counsel has notified the Court that "[a]lthough [Plaintiffs] have not received direct correspondence from the EPA, it is [Plaintiffs' counsels'] assumption, based on coverage of the public meeting regarding the [EPA proposal] held on June 7, 2005 . . . , that [Plaintiffs] have the ability to be included in the option as outlined by EPA."  (Letter to the Court from William J. Delmore dated June 14, 2005 (the "Delmore Letter").)

## STANDARD OF REVIEW

Defendants seek a stay of these proceedings under the doctrine of primary jurisdiction.  The doctrine of primary jurisdiction provides that, under certain circumstances, a court may stay or dismiss a matter within its jurisdiction in favor of an

---

[6]There has been considerable media coverage of the EPA's proposal and the public meeting that followed it.  See, e.g., Tom Meersman, High Levels of Toxins Found in Cass Lake Homes, Minneapolis Star Tribune, May 28, 2005, at A1, A29; Laurie Swenson, EPA Proposes Cleanup, The Bemidji Pioneer, June 8, 2005, A1, A12.

agency's exercise of jurisdiction.  See, e.g., American Auto. Mfrs. Assoc. v. Mass. Dep't of Envtl. Prot., 163 F.3d 74, 80-82 (1st Cir. 1998).  The doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. . . ." Atlantis Express, Inc. v. Standard Transp. Servs., Inc., 955 F.2d 529, 532 (8th Cir. 1992) (quoting United States v. Western Pac. R.R., 352 U.S. 59, 63-64 (1956)).

A district court, however, also has the inherent power to stay proceedings as "a matter of docket management."  Lunde v. Helms, 898 F.2d 1343, 1345 (8th Cir. 1990) (citing Cheyney State College Faculty v. Hufstedler, 703 F.2d 732, 737-38 (3d Cir. 1983)).  While a decision to stay proceedings as a matter of docket management is within the "broad discretion" of the district court, "[t]he proponent of a stay bears the burden of establishing its need.  Clinton v. Jones, 520 U.S. 681, 706-708 (1997) (citing Landis v. North American Co., 299 U.S. 248, 254-57 (1936)).

## ANALYSIS

Although International Paper urges the Court to stay the instant case pursuant to the doctrine of primary jurisdiction, the Court determines that it need not reach the issue of primary jurisdiction at this time.  Instead, the Court will rely on its "power to stay proceedings [which] is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  Landis, 299 U.S. at 254.  "How this can best be done calls for

the exercise of judgment, which must weigh competing interests and maintain an even balance." Id. at 254-55. Pursuant to this standard, the Court will first determine whether a stay of these proceedings is appropriate, and then consider the proper scope of such a stay.

**I.      The Appropriateness of a Stay.**

In Cheyney State College Faculty v. Hufstedler, 703 F.2d 732 (3d Cir. 1983) ("Cheney State"), the Third Circuit affirmed a stay of proceedings under circumstances similar to the instant case. The plaintiffs in Cheyney State brought civil rights claims under Title VI, arguing that Pennsylvania operated a de jure segregated system of higher education. 703 F.2d at 734. Before and during the pendency of the suit, the U.S. Department of Health, Education and Welfare (and subsequently, the U.S. Department of Education) was involved in obtaining a plan from Pennsylvania to assure equal opportunity in higher education. Id. That plan could have implemented some of the relief sought by the plaintiffs. The trial court implemented a limited stay of the action.

The Third Circuit noted that "[a]lthough the doctrines of primary jurisdiction and administrative exhaustion do not apply here, it does not follow that the district court erred in ordering the stay."[7] Id. at 737. The court, relying on Landis, discussed the appropriateness of a stay under the facts of its case:

---

[7]The Court does not, at this time, come to a conclusion regarding whether the doctrine of primary jurisdiction could be applied to the instant matter.

> The issues raised by the plaintiffs' suit <u>are complex and not easily resolved</u>. It is possible that <u>an appropriate solution for at least some of the difficult problems may be obtained more readily through the flexibility of the administrative process now in active progress</u>. Under these circumstances, we cannot say that the district court abused its discretion by imposing a moderate and actively monitored stay.

Id. at 738 (emphasis added).

The Court finds the reasoning of <u>Cheyney State</u> persuasive in the context of the instant case. Here, there is no dispute that "the issues raised by [Plaintiffs'] suit are complex and not easily resolved." <u>Id.</u> The relief requested by Plaintiffs would require the Court to make factual determinations regarding highly technical scientific issues involving environmental pollutants. In their Prayer for Relief, Plaintiffs ask the Court to order Defendants "to ascertain, outline, and define the outer limits of contaminated groundwater and properties . . . ; to remove all hazardous substances, pollutants and contaminants from the groundwater surrounding the wood processing plant, and to clean up, remediate or remove and replace all contaminated property, including Plaintiffs' residences . . . ; [and] to perform such clean up and decontamination within a reasonable time, not to exceed 18 months." (Compl. at 17-18.) The complex factual determinations that Plaintiffs ask the Court to make could be greatly aided by the issuance of the Risk Assessment Report (due July 29, 2005) and the EPA's response thereto.

Not only could the Risk Assessment Report aid the Court in making factual determinations as to Plaintiffs' requested relief, but the Court determines that, as in <u>Cheney State</u>, "[i]t is possible that an appropriate solution for at least some of the difficult

problems may be obtained more readily through the flexibility of the administrative process now in active progress." 703 F.2d at 738.  This conclusion is bolstered by the recent EPA proposal identifying approximately 40 homes on and around the Site that will be the subject of chemical removal procedures.[8]  The EPA proposal

> involves removing and replacing the carpeting in all 40 or so homes near the St. Regis site.  Residents would be temporarily relocated for the 1-2 days of carpeting removal and installation.  In addition, initial and periodic housecleaning for dust removal would be provided until EPA makes a final remedial decision about the site.  <u>At that time, the situation will be looked at again.</u>  Initial housecleaning would involve removal and replacement of heating/air conditioning filters, cleaning all duct work, and a thorough cleaning of all potential areas of dust collection such as upholstery, rugs and draperies. . . .  Finally, clean topsoil would be provided to cover the yards, and grass seed applied to reduce tracking contaminated soil into the home.

(May 2005 Site Update at 3 (emphasis added).)  It is unclear how the Court could immediately enter into this matter and <u>increase</u> the speed and efficiency with which the issues at the Site are now being addressed.  In fact, the Court is wary of taking the parties' focus away from the active administrative proceedings currently underway, and thereby negatively impact the apparent progress being made by the EPA.  <u>See, e.g.</u>, <u>Schwartzman, Inc. v. Atchison Topeka & Santa Fe Railway Co.</u>, 857 F. Supp. 838, 842-43 (D. N.M. 1994) (in response to the plaintiffs' argument that the EPA was not moving quickly enough, noting that the plaintiffs "could expect more delay should this Court assume the role of scientific tribunal").

---

[8] Again, the Court notes that Plaintiffs assume they "have the ability to be included in the option as outlined by EPA." (<u>See</u> <u>supra</u> pp. 10-11, quoting the Delmore Letter.)

Furthermore, the May 2005 Site Update corroborates that the EPA is proposing this cleanup in anticipation of the Risk Assessment Report. According to the May 2005 Site Update, the "proposed cleanup actions are a way to quickly lower exposure for residents while officials wait for the results of an in-depth study called a 'human health and ecological risk assessment,' which should be finished later this year." (May 2005 Site Update at 1; see also id. at 3.) Thus, the Court concludes that waiting for the Report, and the EPA's response thereto, rather than replicating the EPA's efforts and attempting to anticipate its response to the Report, is consistent with the interest of all the parties to this action in arriving at a sound and just solution with efficiency.

The Court recognizes that Plaintiffs are concerned about the perceived lack of progress made by the EPA during its years of involvement at the Site. At oral argument, Plaintiffs also raised their concerns regarding the EPA's standards (as opposed to those of the MDH) for determining what constitutes a harmful level of contamination in residential areas. The Court is cognizant, however, that recently the EPA has been actively involved in attempting to assess and remedy the pollution at the Site. See, e.g., Davies v. Nat'l Coop. Refinery Ass'n, 963 F. Supp. 990, 998 (D. Kan. 1997) (noting that abstention in favor of the environmental agency was proper in part because "after a rather slow start, the [agency] investigation has been more diligently conducted [in the past couple of years] and appears now to be on the verge of addressing remediation").

Moreover, in arguing that the EPA's actions have been inadequate, Plaintiffs rely heavily on the March 2, 2005 MDH Letter directed to the EPA. The MDH Letter referred

15

to dust samples that the EPA analyzed from ten homes located near the Site.  The Letter stated that, based on the fact that six of those ten homes had higher than acceptable levels of contamination, the MDH "strongly urge[s]" the EPA

> to devise a plan to effectively eliminate the on-going exposures to the site contaminants.  While a long-term remedy for the industrial site and impacted residential properties is being developed, <u>immediate intervention in on-going exposures needs to be initiated either through remediation of contamination within the interior of impacted homes</u> or relocation of the residents.  (Emphasis added.)

The Court notes that the EPA's latest proposed cleanup appears to directly address the MDH Letter.  According to the May 2005 Site Update, the EPA's "analysis concluded that the amount of indoor dust contamination from the site exceeded what EPA considers to be acceptable for six of the 10 homes sampled.  Because only 10 of about 40 homes were sampled, the risk to the remaining untested homes is unknown.  <u>EPA is proposing this interim cleanup for that reason</u>."  (May 2005 Site Update at 2 (emphasis added).)

Thus, in attempting to "weigh competing interests and maintain an even balance," <u>Landis</u>, 299 U.S. at 255, it is significant that Plaintiffs' claims for injunctive relief appear to be a priority at the EPA.  Plaintiffs emphasized the MDH Letter as indicating that immediate action was necessary, and the EPA is apparently currently responding to the MDH's (and, by extension, Plaintiffs') concerns.  The Court recognizes that Plaintiffs have claims for damages that will eventually be heard in this forum, as will any claims for

injunctive relief not adequately addressed through the EPA's administrative orders.[9]

However, given the active involvement of the EPA in cleanup and remediation at the Site, the Court determines that it would maximize efficiency to stay these proceedings until the Risk Assessment Report has been issued, and the EPA has had a chance to consider its findings.  Furthermore, the benefits gained by the Court having a more complete factual and scientific record before it will extend to all of the parties involved in this action. Accordingly, having considered the facts of this case as they have been preliminarily presented to the Court, and the posture of this litigation vis-a-vis the EPA's involvement at the Site, the Court determines that a stay of these proceedings is warranted.

## II.     The Scope of the Stay.

International Paper requests that the Court "stay all proceedings until [the] EPA resolves the various factual issues raised in the Complaint."  (Mem. in Supp. at 23.)  The

---

[9]The Court determines that the presence of Plaintiffs' damages claims does not mandate that some or all of this action should progress concurrently with the EPA administrative proceedings.  Instead, the outcome of Plaintiffs' claims for damages is largely dependant on the final outcome of the EPA investigation and any remedial action that is ordered.  Plaintiffs claims for damages stem from their allegations regarding the extent to which the soil, groundwater, and air around their properties is contaminated, and how that may require cleanup and remediation and may have diminished the value of their properties.  These are some of the issues that the Risk Assessment Report due in July 2005 will address.  Thus, if the Court elected to proceed immediately on Plaintiffs' claims for damages, it would necessarily be duplicating much of the work that is being completed now under the direction and expertise of the EPA.  See, e.g., Mississippi Power & Light Co. v. United Gas Pipe Line Co., 532 F.2d 412, 420-21 (5th Cir. 1976) (in referring matter to agency under doctrine of primary jurisdiction, noting that the agency's "informed opinion will be of material aid to the district court in the resolution of the damage action").

Third Circuit observed in Cheyney State, however, that "Landis approved stays of moderate length, and not those of indefinite duration which require a party to take affirmative steps for dissolution." 703 F.2d at 738 (citing Landis). With this observation in mind, the Court will issue a stay, but only of limited duration. Recent developments involving the Site indicate that there is some consensus regarding the current levels of contamination at the Site and the need to address any health risks caused by that contamination. Accordingly, the Court emphasizes that its decision to stay these proceedings arises from its desire to encourage agency ordered remediation without the delay that may accompany judicial proceedings, and it determines that a temporary and limited stay is appropriate given the current administrative involvement at the Site.

The Court will stay these proceedings effective today until further order of this Court. The Court will closely monitor the EPA's progress with the assistance of the parties. Thus, the Court imposes the following requirements on the parties: First, 90 days after International Paper's Risk Assessment Report is due, the parties shall submit a joint report to the Court regarding the status of (1) the Risk Assessment Report and (2) the EPA's response to it (the "Joint Report").[10] Each of the parties will agree to the contents of the Joint Report, and will attest to that agreement by signing it (or an attachment thereto). Second, every 60 days after today, the parties shall submit a joint letter to the

---

[10]The Court assumes that subsequent to the issuance of the Risk Assessment Report, the EPA will promptly review the Report and determine whether it will order further remedial relief pursuant to the statements it made in the May 2005 Site Update.

Court (the "Update Letter"), regarding what decisions have been made and/or actions taken to clean up or remedy contamination on the Site (if none, then that should be so stated). Each of the parties will agree to the contents of the Update Letter and will attest to that agreement by signing the Letter (or an attachment thereto).[11]

## CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein **IT IS ORDERED** that Defendant International Paper's Motion to Dismiss all or Strike Portions of or in the Alternative to Stay Proceedings (Doc. No. 22) is **GRANTED IN PART** as follows:

    A.    The proceedings in this matter, including discovery, are **STAYED** until further order of the Court;

---

[11] Although the Court is directing the submission of a <u>Joint</u> Report and of <u>joint</u> Update Letters, and it expects the parties to comply with that direction, if they cannot do so, they are to submit separate Reports and Update Letters.

B.  The parties shall submit a Joint Report to the Court 90 days after July 29, 2005, regarding the status of the Risk Assessment Report and the EPA's response thereto; and

C.  The parties shall submit an Update Letter to the Court every 60 days regarding what, if any, decisions have been made and/or actions taken to clean up or remedy contamination on the Site.[12]

Dated: June __21__, 2005        s/Richard H. Kyle
                  RICHARD H. KYLE
                  United States District Judge

---

[12]To avoid any misunderstanding, this case is <u>not</u> dismissed and Plaintiffs' claims for injunctive relief are <u>not</u> stricken.