**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Michael Bennett, Colleen Bennett,
Raymond A. Brogger, Phyllis Brogger,
Cynthia Gurnsey, Michael G. Newago,
Sherri L. Newago, Donald Finn, and
Lois Northbird,

                                  Plaintiffs,

                                                               Civ. No. 05-38 (RHK/RLE)
                                                               **MEMORANDUM OPINION**
                                                               **AND ORDER**

v.

International Paper Company,
Burlington Northern and Santa Fe
Railway Company, Dow Chemical
Company, and Monsanto Company,

                                Defendants,

v.

Burlington Northern and Santa Fe
Railway Company,

                                Cross Claimant,

v.

International Paper Company,
Dow Chemical Company,
and Monsanto Company,

                                Cross Defendants.

William J. Delmore, Kelsch Kelsch Ruff & Kranda, Mandan, ND; Gary M. Hazelton, Hazelton Law Firm, PLLC, Bemidji, MN; James P. Carey and John W. Carey, Sieben Grose Von Holtum & Carey, Ltd, Minneapolis and Fairfax, MN; and Wilbur William Fluegel, Fluegel Law Office, Minneapolis, MN, for Plaintiffs.

R. Raymond Rothman, Michael S. McDonough, and Tiffany R. Hedgpeth, Bingham McCutchen LLP, Los Angeles, CA; and Carolyn V. Wolski, Leonard Street and Deinard, Minneapolis, MN, for Defendant International Paper Company.

Timothy R. Thornton and Timothy G. Gelinske, Briggs and Morgan, PA, Minneapolis, MN, for Defendant Burlington Northern and Santa Fe Railway Company.

Sarah L. Brew, Greene Espel, Minneapolis, MN; and Fazal R. Khan and Lise T. Spacapan, Jenner & Block, Chicago, IL, for Defendant Dow Chemical Company.

Robert W. Vaccaro and George W. Flynn, Flynn Gaskins & Bennett, LLP, Minneapolis, MN; and C. Ron Hobbs, II, Jerry K. Ronecker, and Kenneth R. Heineman, Husch and Eppenberger, LLC, Clayton, MO, for Defendant Monsanto Company.

On June 21, 2005, the Court issued a temporary and limited stay of this action, pursuant to its "inherent power to stay proceedings as a matter of docket management." (Doc. No. 76 (Memorandum Opinion and Order dated June 21, 2005 ("June Order")), p. 11.)  It issued the stay in anticipation of the issuance of a Human Health and Ecological Risk Assessment Report (the "Risk Assessment Report"), which Defendant International Paper was in the process of preparing pursuant to an order from the Environmental Protection Agency (the "EPA").  (See June Order at 15, 17.)  The Court also intended to allow the EPA some time "to consider [the Risk Assessment Report's] findings," as the EPA had indicated it would do following the Report's completion.  (See id. at 17.)  At the

time of the June Order, International Paper's draft of the Risk Assessment Report (the "Draft Report") was due on July 29, 2005 (just over a month after the issuance of the Order). (See id. at 13.) And the Court "assume[d] that subsequent to the issuance of the [Draft] Report, the EPA will promptly review the Report and determine whether it will order further remedial relief." (Id. at 18 n.10.)

Following the issuance of the June Order, the Draft Report deadline was pushed back to November 2005, and International Paper submitted the Draft Report to the EPA on November 16, 2005. (See 2/14/06 Update Letter.) The EPA is currently reviewing the Draft Report, and the parties expect its written comments on the Report "shortly." (See BNSF Mem. in Opp'n at 2.) International Paper asserts that both it and the EPA "anticipate that the Risk Assessment [Report] will be finalized by summer 2006." (IP Mem. in Opp'n at 3.) The EPA anticipates that the final Risk Assessment Report will provide the basis for what, if any, additional remediation is needed on the Site[1]. (See 11/05 Meeting Tr. at 19-20[2]; BNSF Mem. in Opp'n at 11.)

Also subsequent to the June Order, on September 29, 2005, the EPA issued a third Five-Year Review Report regarding the Site (it issued five-year reviews in 1995 and 2000 as well). (See Five-Year Review at vi.) The purpose of the Five-Year Review was to

---

[1] Any terms not defined in this Order have the same meaning as set out in the June Order.

[2] In November 2005, the EPA held a public meeting in Cass Lake to discuss recent cleanup and research done at the Site and the interim remedial plan, which has now been implemented. (See infra pp.4-5.) The transcript of that meeting will be cited as "11/05 Meeting Tr."

evaluate the effectiveness of a previously implemented remedy at the Site. (See id.) The Five-Year Review determined that the previous remedy:

> is not protective of human health with regards to site soil. Surface soil contamination exceeds Removal Action Levels (RALs) in some on-site areas and there are insufficient institutional controls to prevent human exposure. House dust contamination has been detected in living areas of homes and no controls are in place to prevent human exposure.

(Id. at 17.) There are also ongoing issues with respect to the groundwater on the Site, although the drinking water for the residents living on the Site is apparently not affected because those residents are hooked up to the municipal drinking water supply. (Id.) The Five-Year review "will be updated in a supplement" once the information from the final Risk Assessment Report is available. (Id.)

On December 2, 2005, the EPA issued a Unilateral Administrative Order mandating that International Paper perform certain remedial actions to address the house dust issues identified in the Five-Year Review. That remedial action is currently underway on some of the residential properties on the Site[3] and includes: removal and replacement of carpeting[4]; professional cleaning of all rugs and draperies; cleaning of all duct work; covering all yards

---

[3] Some of the residents on the Site opted not to take part in the remedial action; at least one of the Plaintiffs in this action has opted out of the dust removal plan. (See Reply Mem. at 2.)

[4] The removal and replacement of carpets, as well as the other initial cleaning of homes, will be conducted by hazardous material workers. (See 11/05 Meeting Tr. at 25-26.) The EPA stated that those hazardous material workers "are going to be wearing moon suits." (Id.) According to the EPA, "the reason for that is that there's a liability issue . . . not because [the EPA feels] like they've got a particular lifetime risk because of this exposure, but it's just meant as a precaution and meant as liability." (Id.)

with clean soil and grass seed; application of dust suppressant on roadways; and periodic follow-up cleaning of residences.[5] (See, e.g., BASF Mem. in Opp'n at 7.) International Paper expects that the remedial cleaning will be finished this month, and that the soil work will be completed in the "next few months." (IP Mem. in Opp'n at 5.)

The EPA has characterized the house cleaning and soil work as "an interim action." (11/05 Meeting Tr. at 5.) "It's only meant to be addressing the risks that [the EPA has] seen at the site until a final remedy is [selected]." (Id. at 5-6.) At the November 2005 public meeting, the EPA addressed the issue of the timing of a final remedy:

> A final remedy can take some time. Once we've developed what the action is going to be, or actions, if there're going to be additional actions, then we go through a negotiation period which could last as much as a year or more with the responsible party to do that work. So we could be looking at a two-year time frame.

(Id. at 6.) The EPA also stated that any work that is ordered in a final remedial action might not begin until "two years from now." (Id. at 22.) International Paper, however, "expects that EPA's investigation and decision as to a final remedy will be finalized before the end of 2006." (IP Mem. in Opp'n at 6.)

Plaintiffs have now moved to vacate the June Order and lift the stay. (Doc. No. 80.) They argue that the delays in the EPA's actions are ongoing and pose unacceptable risks to Plaintiffs (Mem. in Supp. at 4-8), and that "technical and scientific knowledge has been increased since the time of the [June] Order" (id. at 8-9). Defendants oppose the Motion to

---

[5]The Court's June Order anticipated this remedial plan. (See June Order at 9-10, 14.)

Lift the Stay, arguing that the Court should maintain the stay until the final Risk Assessment Report is completed, <u>and</u> "a final remediation determined." (IP Mem. in Opp'n at 7.) According to Defendants, "[e]ven Plaintiffs' damages claims require the Court to rule on the same scientific and technical decisions that EPA is making." (<u>Id.</u>)

As noted above, the Draft Report has been issued and the parties are in agreement that the EPA's consideration of the Report is ongoing and soon will result in written comments. This is consistent with the EPA's estimate that the Risk Assessment Report will be finalized in "early" 2006. (11/05 Meeting Tr. at 30.) The Court's rationale for issuing the temporary and limited stay in the June Order revolved largely around its determination that "it would maximize efficiency to stay these proceedings <u>until the Risk Assessment Report has been issued, and the EPA has had a chance to consider its findings</u>." (June Order at 17 (emphasis added).) The Court determines that the progress that the parties and the EPA have made toward the issuance of the final Risk Assessment Report supports Plaintiffs' Motion to Lift the Stay.[6]

Despite the progress that has been made, Defendants argue that the Court should not lift the stay on Plaintiffs' damages or injunctive claims prior to the finalization of the

---

[6]Furthermore, according to Defendant BNSF, the Draft Report "identifies no adverse risks for residents, long-term onsite workers, or individuals engaged in recreational activities." (BNSF Mem. in Opp'n at 8 (citing to the entire Report).) Therefore, it does not appear to the Court that any use of the Draft Report prior to its finalization would serve to disadvantage Defendants. In addition, as the EPA's comments to the Draft Report are expected by the parties shortly, in reality it is unlikely that the parties will need to rely on the Draft Report for very long.

Report and the EPA's final remediation determination. With respect to the damages portion of Plaintiffs' claims, Defendants acknowledged in their submissions in support of the original stay of these proceedings that "courts do not ordinarily refuse to hear cases regarding damages . . . ." (IP Mem. in Supp. (Doc. No. 24) at 23; see also BNSF Response Mem. (Doc. No. 53) at 7-8.)  Now, with the scientific data collection completed, and the EPA's comments on the Draft Report "forthcoming" (BNSF Mem. in Opp'n at 8), Defendants are essentially arguing that the Court should not allow Plaintiffs' damages claims to go forward because the valuation of the properties "cannot be performed until cleanup is completed." (BNSF Mem. in Opp'n at 9.)  There is no support for this proposition, and generally "[c]ourts refuse to defer jurisdiction if the plaintiff is seeking damages for injury to property or person, as this is the type of relief courts routinely consider."[7]  Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Railway Co., 857 F. Supp. 838, 843 (D. N.M. 1994) (discussing doctrine of primary jurisdiction).

The Court comes to the same conclusion with respect to Plaintiffs' claims for injunctive relief.  Indeed, according to International Paper, "the cornerstone of EPA's final remedy determination—the Risk Assessment—is in the process of being finalized."  (IP

---

[7]The Court's initial decision to stay the damages claims in the June Order stemmed from its concern that proceeding on those claims without the aid of the Risk Assessment Report "would necessarily be duplicating much of the work that is being completed now under the direction and expertise of the EPA." (June Order at 17 n.9.)  While Defendants may argue that the ongoing EPA involvement at the Site could affect the amount of damages ultimately due to Plaintiffs (if any), that further remediation may be ordered cannot prevent a jury from considering Plaintiffs' claims.

Mem. in Opp'n at 6.) To the extent that the EPA's determination of a final remedy will take longer than the finalization of the Risk Assessment Report (according to the EPA's own estimates, a final remediation determination could take two years (see Meeting Tr. at 6; supra p.5)), the Court is not prepared to continue the stay for that length of time.[8]

While the Court agrees with Plaintiffs that, with the finalization of the Risk Assessment Report pending, there is little reason to maintain the stay, it also recognizes that the EPA is in the process of commenting on the Draft Report, and "[t]echnical discussions between the EPA and International Paper to resolve EPA's preliminary

---

[8]In their Reply, for the first time, Plaintiffs submitted affidavits from "three nationally recognized medical experts" (Reply Mem. at 2), each of which states (in nearly identical language):
> each day the nearby residents, including Plaintiffs, remain on the site and are continuously exposed to [the] chemicals [found to be on the Site] presents a serious risk to these residents by aggravating current health problems or causing other serious health problems in the future.

(Olson Aff. ¶ 13; see also Schecter Aff. ¶ 15, Clapp Aff. ¶ 15.) The affiants do not explicitly address whether or not their statements apply in light of the cleanup efforts that have taken place in the last couple of months (although, Plaintiffs's state in their Reply Memorandum that the affiants reviewed the "decision regarding action or inaction from EPA" (Reply Mem. at 2)), nor do they address how the EPA's involvement at the Site generally might affect their conclusions.

Defendants have moved to strike those affidavits. (See Doc. No. 104.) As the Court noted at oral argument, it finds the affidavits to be of little—if any—use, due to their conclusory nature. See Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1055 (8th Cir. 2000) (a district court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytic gap between the data and the opinion offered." (internal quotation omitted)). However, because the Court determines that the Plaintiffs' Motion ought be granted on the ground that the finalization of the Risk Assessment Report is forthcoming (reasoning not dependant on the affidavits submitted), it will deny the Motion to Strike as moot.

comments on the document have already begun." (IP Mem. in Opp'n at 3.) Therefore, in an effort to encourage a <u>speedy</u> finalization of the Risk Assessment Report, the Court will order a delayed lifting of the stay on Plaintiffs' claims, to be effective on June 30, 2006.

## Conclusion

Based on the foregoing, and all the files, records, and proceedings herein **IT IS ORDERED** that:

(1) Plaintiffs' Motion to Vacate Order and Lift Stay (Doc. No. 80) is **GRANTED** as follows: the stay imposed by the June Order (Doc. No. 76) will be lifted effective June 30, 2006[9]; and

(2) Defendant BNSF's Motion to Strike the Affidavits of Messrs. Schecter, Clapp and Olson (Doc. No. 104) is **DENIED AS MOOT**.

Dated: April 25, 2006
s/ Richard H. Kyle
RICHARD H. KYLE
United States District Judge

---

[9]To the extent that the Rule 16 Pretrial Order (Doc. No. 75) will need modification, the parties, notwithstanding the stay now in effect, may move Chief Magistrate Judge Erickson for a second Rule 16 pretrial conference, and such conference may be held at anytime Judge Erickson directs.