UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MICHAEL BENNETT, COLLEEN BENNETT, RAYMOND A. BROGGER, PHYLLIS BROGGER, MICHAEL G. NEWAGO, SHERRI L. NEWAGO, DONALD FINN, LOIS NORTHBIRD, SHARON BURNETTE, GARY L. CHASTEK, LOUIS E. FOURNIER, GLORIA J. FOURNIER, WAYNE D. FRAZER, ELAINE BOHN GANGELHOFF, GARY G. GEHRKE, DELORES HOUGH, KARL HUMPHREY, LORI HUMPHREY, IVA LADUKE, DUANE A. MULLER, WANDA MULLER, MARIA REA, JANE REA, TODD M. STAPLES, BLANCA DURAN, JOHN R. UTLEY, RUTH A.M. WITTNER, and MICHELLE WORCESTER, Plaintiffs, v. INTERNATIONAL PAPER COMPANY and BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, Defendants. | Case No. 05-CV-0038 (PJS/RLE)<br><br><br><br><br><br>ORDER DENYING MOTION FOR SUMMARY JUDGMENT |

James P. Carey and Shannon C. Keil, SIEBEN, GROSE, VON HOLTUM & CAREY, LTD; Sharon L. Van Dyck, VAN DYCK LAW FIRM; Gary M. Hazelton, HAZELTON LAW FIRM PLLC; and William J. Delmore, KELSCH KELSCH RUFF & KRANDA, for plaintiffs.

Joseph W. Anthony and Cheryl A. Stanton, ANTHONY OSTLUND BAER LOUWAGIE & ROSS P.A., for defendant International Paper Company.

Timothy R. Thornton, Timothy G. Gelinske, and Matthew R. Brodin, BRIGGS & MORGAN, P.A., for defendant Burlington Northern and Santa Fe Railway Company.

For nearly thirty years, defendant International Paper Company ("IP") operated a wood-treatment plant in Cass Lake, Minnesota, on land leased from defendant Burlington Northern and Santa Fe Railway Company ("BNSF").[1] IP dismantled its plant in 1985.

Plaintiffs own homes on or near the land on which IP's plant operated. Plaintiffs allege that their property was contaminated by hazardous waste released by IP during its operation of the plant. Plaintiffs now seek to recover damages from IP (and BNSF) under the Minnesota Environmental Response and Liability Act ("MERLA"), Minn. Stat. §§ 115B.01 et seq., and the common law. Defendants move for summary judgment, arguing that all of plaintiffs' claims are barred by the statute of limitations. For the reasons set forth below, the Court denies defendants' motion.

I. BACKGROUND

Cass Lake is a town in northern Minnesota located within the boundaries of the Leech Lake Indian Reservation. Hegland Dep. 43-44. BNSF tracks run east to west through Cass Lake, bisecting the town into a larger northern section and a smaller southern section. Larson Aff. Ex. 1, Dec. 5, 2008 [hereinafter "Larson Aff."]; Brodin Aff. Ex. 3, Dec. 5, 2008 [hereinafter "Brodin Aff."]. IP began leasing land from BNSF in 1949 for the purpose of building and operating a wood-treatment plant in Cass Lake. Larson Aff. Ex. 5. The site of IP's plant (the "Site") consists of about a half-mile-long strip of land running along the south side of the BNSF

---

[1]Both BNSF and IP are successors to other companies. IP's predecessors include the Wheeler Lumber Bridge & Supply Company, the St. Regis Paper Company, and Champion International Corporation. For simplicity's sake the Court refers to IP and all of its predecessors collectively as "IP" except when quoting portions of the record. Similarly, the Court refers to BNSF and its predecessors collectively as "BNSF."

tracks. Brodin Aff. Ex. 2. Most plaintiffs own homes that are located south of the Site. Brodin Aff. Ex. 2. The city dump is located south of these homes.

IP operated a wood-treatment plant on the Site from the late 1950s until 1985. Westerdahl Dep. 17, 35. Before treating the wood, workers at the plant would peel off the bark and cut the wood to shape. Eidsmoe Dep. 76; K. Humphrey Dep. 135. The untreated bark and wood scraps were burned in a "teepee burner." Eidsmoe Dep. 80; K. Humphrey Dep. 165. The remaining wood was placed into cylinders where it was pressure-treated, typically with an oil-based chemical solution containing creosote or pentachlorophenol. R. Brogger Dep. 112; K. Humphrey Dep. 138; Lausche Dep. 198-99; Ross Dep. 74-75. Ammoniacal copper arsenate, a water-based wood preservative, was also used at the Site. Westerdahl Dep. 226-30; Brodin Aff. Ex. 9 at 2 ¶ 3. Treated wood was removed from the cylinders and stacked on the ground around the Site, where excess oil would drip onto the ground. L. Fournier Dep. 23; Rea Dep. 137-38. The treated wood would eventually be shipped out.

Periodically, workers at IP's plant would clean out the mixture of debris and chemical residue — commonly called "sludge" — that would form on the bottom of the cylinders. Chastek Dep. 27-28; Lausche Dep. 200; Westerdahl Dep. 34. Initially, sludge from the cylinders was sent to the city dump to be burned. Westerdahl Dep. 70. Some sludge was also dumped on the Site itself. Chastek Dep. 31, 94; L. Fournier Dep. 41-42; Brodin Aff. Ex. 9 at 3 ¶ 5. In the mid-1970s, IP began shipping sludge to a hazardous-waste facility. Westerdahl Dep. 70-71.

Aside from the sludge, the treatment process also generated chemically contaminated wastewater. Initially, after filtration, the wastewater was discharged into a holding pond and then taken to the city dump. Ross Dep. 79-80; Swearingen Dep. 106-07. Later, in the 1970s, treated wastewater was transferred to an oxidation pond that IP built on the Site. Westerdahl Dep. 73-

74, 87. Witnesses also recall seeing IP spray wastewater on Site roads to keep down the dust. L. Fournier Dep. 23-26; Lausche Dep. 118-19, 201. By the 1980s, IP had changed its treatment process to minimize the production of wastewater. Ross Dep. 80-81; Westerdahl Dep. 75-76; Brodin Aff. Exs. 10-11. After 1980, wastewater that could not be reused or evaporated was treated in Cass Lake's sewage-treatment facility. Brodin Aff. Ex. 9 at 3 ¶ 4.

Cass Lake residents commonly walked through the Site to go from one side of town to the other, and children often played among the piles of treated wood on the Site. Bruce Dep. 33-34; Chastek Dep. 13, 15; Finn Dep. 21, 171-72; L. Fournier Dep. 29-30; Frazer Dep. 28-30; Hough Dep. 36; K. Humphrey Dep. 161; Rea Dep. 76-77; Utley Dep. 32-33; Wittner Dep. 62-63, 68. Long-time residents remember seeing oil spills and oily puddles on the Site and getting a black substance on their clothes when they climbed on the treated logs. Bruce Dep. 54-55; Chastek Dep. 13; Finn Dep. 21; L. Fournier Dep. 31; K. Humphrey Dep. 161-62; Rea Dep. 76-77; Utley Dep. 32-34. Many residents recall that the plant generated a foul smell at least some of the time. M. Bennett Dep. 25; Chastek Dep. 31; Erickson Dep. 14; Hough Dep. 33; Utley Dep. 31; *see also* Brodin Aff. Ex. 12 (1986 letter complaining of "the stench from the plant"); Brodin Aff. Ex. 29 (1981 letter complaining of "air which is completely fouled with the chemicals used in the wood treating process"). Others residents do not remember a bad smell coming from the plant. Eidsmoe Dep. 75-76; Gangelhoff Dep. 53.

In 1980, Congress passed the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq., popularly known as the Superfund Act. Pursuant to CERCLA, the Environmental Protection Agency ("EPA") placed the Site, along

with the city dump, on the National Priorities List ("NPL") in September 1984.[2] Brodin Aff. Ex. 9 at 3 ¶ 7. After the Minnesota Pollution Control Agency ("MPCA") took primary responsibility for the Site, there followed a period of intense remedial activity. Brodin Aff. Ex. 9 at 3 ¶ 8. The MPCA and IP signed two consent orders providing for a remedial investigation of the Site, the development and implementation of a response plan, and followup monitoring. Brodin Aff. Ex. 9 at 3 ¶ 8. These orders covered both the Site and the city dump. Brodin Aff. Ex. 9 at 3 ¶ 8. In 1986, the MPCA issued two Enforcement Decision Documents ("EDDs"), one for the Site and one for the dump.[3] Brodin Aff. Exs. 14, 23. The EDDs called for installing a groundwater treatment system on the Site, excavating contaminated soil from the Site, constructing a containment vault for the contaminated soil, connecting nearby residents to city water, and conducting long-term monitoring. Brodin Aff. Ex. 14.

IP shut down and dismantled the Cass Lake plant in 1985. Westerdahl Dep. 17. Over the next couple of years, IP conducted a massive cleanup operation, which involved connecting nearby residents to the municipal water system, constructing a groundwater treatment system, building a hazardous-waste containment vault, and moving 42,000 cubic yards of sludge and contaminated soil from the Site into the vault. Brodin Aff. Ex. 17 at 6; Brodin Aff. Ex. 18 at 6; Brodin Aff. Ex. 34; Keil Aff. Ex. 11 at 2, Dec. 31, 2008 [hereinafter "Keil Aff."]. Since that time, IP has operated the treatment system and the vault with oversight from the MPCA and,

---

[2]The NPL, which is commonly called the Superfund list, is a list of cleanup priorities among hazardous waste sites around the country. *Carus Chem. Co. v. U.S. Envtl. Prot. Agency*, 395 F.3d 434, 437 (D.C. Cir. 2005).

[3]The EPA defines an "enforcement decision document" as "[a] document that provides an explanation to the public of EPA's selection of the cleanup alternative at enforcement sites on the National Priorities List." EPA, Terms of Environment: Glossary, Abbreviations and Acronyms (Aug. 2007), *available at* http://www.epa.gov/OCEPAterms/ (last visited May 27, 2009).

later, the EPA. Both agencies have issued periodic reports on the status of the Site. Brodin Aff. Ex. 18 at 2, 6-7; Brodin Aff Ex. 17; Keil Aff. Ex. 11 at 2. To date, IP has spent over $20 million on remediation of the Site. Brodin Aff. Ex. 24 ¶ 5. The Site's placement on the NPL and the subsequent cleanup were extensively publicized throughout Cass Lake and nearby communities.

In July 2001, the EPA announced that it would conduct soil and groundwater sampling of residential yards and wells near the Site. Keil Aff. Ex. 11 at 3. The EPA announced the results of that sampling in 2003. Keil Aff. Ex. 12. In letters mailed to Cass Lake residents, the EPA warned that "[y]ou, your family, and friends need to avoid a lot of contact with the dust and dirt in your neighborhood." Keil Aff. Ex. 12. Since that time, IP has conducted indoor residential dust sampling and cleanup and placed soil and seed cover on residential yards. Keil Aff. Ex. 15 at 8; *see also* Docket No. 123 at 4-5. The EPA has now identified the residences south of the Site as a unit of the Superfund area. Keil Aff. Ex. 15 at 7-8; Keil Aff. Ex. 16.

## II. ANALYSIS

### *A. Standard of Review*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In considering a motion for summary judgment, a court "must view the evidence and the inferences

that may be reasonably drawn from the evidence in the light most favorable to the non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

## B. Timeliness

Eight of the plaintiffs — Michael Bennett, Colleen Bennett, Raymond Brogger, Phyllis Brogger, Michael Newago, Sherri Newago, Donald Finn, and Lois Northbird — filed the original complaint in this matter on January 6, 2005.[4] *See* Docket No. 1. The remaining plaintiffs joined this action with the filing of the first amended complaint on June 18, 2007. *See* Docket No. 231. All parties agree that plaintiffs' claims against IP and BNSF are subject to six-year statutes of limitation.[5] Thus plaintiffs' claims are untimely if they accrued before January 6, 1999 (for the original plaintiffs) or June 18, 2001 (for the additional plaintiffs). The question, then, is when did plaintiffs' claims accrue?

The parties have extensively briefed this issue and, at the Court's request, engaged in two rounds of oral argument, which has helped to narrow the dispute considerably. The parties now agree that, pursuant to 42 U.S.C. § 9658 of CERCLA, the "discovery rule" determines the date on which plaintiffs' causes of action accrued. The parties agree that plaintiffs' claims accrued, and the six-year statute of limitations began to run, when plaintiffs knew, or reasonably should have discovered, that they had suffered a legally compensable injury as a result of their land being contaminated by the release of hazardous substances at the Site. 42 U.S.C. § 9658(a)(1),

---

[4]A ninth plaintiff, Cynthia Gurnsey, has since stipulated to the dismissal of her claims without prejudice. *See* Docket Nos. 245, 247.

[5]Plaintiffs assert that all of their claims are subject to the six-year limitations period in Minn. Stat. § 115B.11. Defendants assert that, while some of plaintiffs' claims are subject to § 115B.11, others are subject to the six-year limitations period in Minn. Stat. § 541.05, subd. 1(5). Because all parties agree that all claims are subject to a limitations period of six years, the Court need not decide *which* six-year statute of limitations applies to each claim.

(b)(4)(A) (limitations period for state-law actions for property damage caused by the release of a hazardous substance begins running when the plaintiff knew or should have known that the property damage was caused by the hazardous substance); *Union Pac. R.R. v. Reilly Indus., Inc.*, 215 F.3d 830, 840-41 (8th Cir. 2000) (under § 9658 and Minnesota law, the limitations period for property damage claims begins running when the plaintiff knew or reasonably should have known that its land was contaminated); *cf. MacRae v. Group Health Plan, Inc.*, 753 N.W.2d 711, 719-20 (Minn. 2008) (plaintiff's claim could not accrue under the "damage rule" before he suffered some legally compensable damage).[6]

At the first hearing on defendants' motion for summary judgment, plaintiffs asserted that they could recover for "pure" stigma damages. In other words, plaintiffs claimed that they could recover for damages caused by the stigma of being near a Superfund site, even if they could not prove that their land had been contaminated. Hr'g Tr. 34-35, Mar. 4, 2009. Presumably the measure of "pure" stigma damages would be the difference between the present fair market value of a home and what the fair market value of the home would be if the home were not located near a Superfund site.

---

[6]In *MacRae*, the Minnesota Supreme Court applied the "damage rule," under which a plaintiff's cause of action accrues when the plaintiff suffers damage. *MacRae*, 753 N.W. 2d at 719. It is not enough, the court explained, for the plaintiff to suffer damage in the abstract; the damage suffered must be legally compensable in order for the plaintiff to have a cause of action. *Id.* at 720. As discussed above, the "discovery rule" applies in this case, thus postponing accrual until plaintiffs both suffered damage and had actual or constructive knowledge of the damage. Although *MacRae* did not apply the "discovery rule," the logic of *MacRae* — that a cause of action cannot accrue until the plaintiff has suffered not just any damage, but legally compensable damage — is equally applicable here. A plaintiff obviously cannot be expected to discover the existence of damage that she has not yet suffered, and unless such damage is legally compensable, she has no cause of action.

As the Court pointed out, though, plaintiffs had actual or imputed knowledge of "pure" stigma damages over twenty years ago. If plaintiffs indeed suffered a legally compensable injury by virtue of owning a home near a Superfund site, then plaintiffs knew or should have known of this injury in 1984, when the EPA placed the Site on the NPL. Obviously, at that point, plaintiffs would have known that they owned land near a Superfund site, and plaintiffs would have known that being near a Superfund site might harm their property values. That being the case, the Court asked the parties whether all of plaintiffs' claims would be barred under the rule that a plaintiff's entire cause of action accrues when the plaintiff knows or should know of some compensable injury, even if the full extent of the damages is not yet known. *See Highland Indus. Park, Inc. v. BEI Def. Sys.*, 357 F.3d 794, 797 (8th Cir. 2004) ("we know of no state whatever in which an injured party must know the full extent of the damages that it may recover before the statute of limitations begins to run on its claim"); *Pamida, Inc. v. Christenson Bldg. Corp.*, 285 F.3d 701, 704-05 (8th Cir. 2002) (two-year limitations period of Minn. Stat. § 541.051 began running upon discovery of the initial property damage in 1996, even though greater damage occurred later).

At plaintiffs' request, the Court permitted the parties to submit supplemental briefing regarding this inquiry. In their supplemental brief, plaintiffs did an about-face. Plaintiffs argued that, contrary to their earlier assertions, homeowners *cannot* recover for "pure" stigma damages. Instead, a homeowner cannot recover damages unless his land was contaminated. If his land was contaminated, a homeowner can seek compensation for any injuries flowing from that contamination, including damages caused by the stigma associated with the contamination. *See* Docket No. 439 at 3-5.

Plaintiffs' change of position resulted in a rather strange second hearing on defendants' summary-judgment motion. At the hearing, *plaintiffs* argued that Minnesota law does not permit

them to recover "pure" stigma damages, while *defendants* argued — at least initially — that the issue was unsettled and that they might indeed be held liable for "pure" stigma damages. Eventually, though, defendants conceded (as appears to be the law) that none of plaintiffs' claims accrued until plaintiffs knew or had reason to know that their land was contaminated. After much briefing and argument, then, the sole question before the Court is whether a reasonable jury could find that plaintiffs lacked actual or imputed knowledge that their property was contaminated until on or after January 6, 1999 (for the original plaintiffs) or June 18, 2001 (for the additional plaintiffs).

There is overwhelming evidence that, long before 1999, plaintiffs knew or should have known that *the Site itself* had been contaminated by the operation of IP's wood-treatment plant. The record is replete with evidence that city residents could and did see for themselves that IP had for decades discharged creosote and other contaminants onto the Site. The record is also replete with evidence of the massive clean-up operation that IP undertook in the mid-1980s.

Defendants argue that plaintiffs also knew or should have known by the mid-1980s that *land near the Site* — including plaintiffs' properties — had been contaminated. Defendants point to evidence that, by the 1980s, some residents had expressed the belief that IP's activities were polluting other parts of the city. Brodin Aff. Ex. 12 (1986 letter threatening legal action because the residents' "lifelong home has been rendered worthless by the plant and water contamination"); Brodin Aff. Ex. 29 (1981 letter stating that "we are contemplating a law suit against the Wheeler Lumber Company in order to prevent them from polluting not only the ground and the water but the air as well"). Defendants also point out that, after the EPA and the MPCA arrived on the scene, the contamination at the Site was thoroughly publicized through community meetings and press reports. Cleanup activities — including the excavation of tens of

thousands of cubic yards of soil and the removal of that soil to a containment vault — took place openly over a period of several years. Out of concern for potential contamination, wells were capped, and residents were hooked up to city water. With the entire area under the spotlight, defendants argue, any reasonable landowner would have investigated the possibility that his land was contaminated.

Defendants have a decent argument, and the Court was tempted to grant their motion for summary judgment. Ultimately, though, what persuaded the Court to leave the statute-of-limitations issue for the jury is this: Although the EPA, the MPCA, and IP devoted a great deal of attention to detecting and remedying the contamination of the *Site* beginning in 1984, there is little evidence that either the government or IP was concerned about possible contamination of properties *near* the Site until July 2001, when the EPA announced that it would be conducting residential soil sampling. To the contrary, in the mid-1980s, when the Site was being cleaned up, plaintiffs had reason to believe that the pollution was confined to the Site and that off-Site remedial measures were purely precautionary.

For example, plaintiffs cite a November 14, 1985 "fact sheet" distributed by the MPCA, presumably to the residents of Cass Lake (including plaintiffs). Under the heading "Are the residents affected?," the document states as follows:

> *Residents in the area are not exposed to the contaminated material.* There is no evidence that the PCDDs [polychlorinated dibenzodioxins] have affected drinking water in the area. Sampling of Cass Lake city wells has not detected any compounds associated with PCDDs.
>
> Under the clean-up contract with the MPCA, Champion will take the necessary measures to clean up the contamination so that the pentachlorophenol and PCDD-contamination will not present a future threat to the environment.

-11-

Keil Aff. Ex. A at 2, Mar. 18, 2009 (emphasis added). Similarly, an October 1986 article in a Bemidji newspaper reported that "[f]ollowing a series of intensive tests, no contamination was found in the groundwater or in fish samples in nearby Pike Bay." *See* Brodin Aff. Ex. 34. In the same article, a spokesman for IP portrayed the extension of city water to area residents as essentially a precautionary measure that was not based on evidence of actual contamination. *Id.*

Morever, a number of plaintiffs testified that the cleanup was regarded as a success, and plaintiff Duane Muller, who worked on the cleanup at the Site, recalled that inspectors in charge of the cleanup told him that they had gotten all of the contaminated material. D. Muller Dep. 57-58; C. Bennett Dep. 98; R. Brogger Dep. 20, 79-80; L. Fournier Dep. 21, 68-69, 189-90; *see also* Brodin Aff. Ex. 34 (1986 newspaper article quoting IP spokesman characterizing "the overall effort [as] a real classic success story"). Two plaintiffs, upon purchasing former Site land from the city, asked about the possibility of contamination and were specifically assured by city employees that the land was not contaminated. Finn Dep. 33-34 (city manager told him that "It's all done. It's cleaned up. They removed the dirt."); W. Muller Dep. 66-68 (city clerk told her that the land was cleaned up); D. Muller Dep. 9, 32-34 (describing his wife's conversation with the city clerk).

In light of this evidence, the Court cannot hold, as a matter of law, that plaintiffs knew or should have known before July 2001 that their land may have been contaminated. Again, the question is what a reasonable homeowner living in the small community of Cass Lake would have concluded about the contamination of his property. In the 1980s, such a homeowner would have seen the EPA and the MPCA — two agencies that were charged with safeguarding the public health and that had far more resources and expertise than any Cass Lake resident — swarming over the Site but showing almost no concern about land near the Site. After

witnessing the government and IP devoting significant resources to the Site itself but few resources to nearby properties — and after being told by the government that the groundwater was clean, that the pollution at the Site had been cleaned up, and that "[r]esidents in the area are not exposed to the contaminated material" — a homeowner might well have concluded that his property was not contaminated. And a jury might well find that the homeowner acted reasonably in reaching that conclusion.

Defendants point to later events that, they contend, should have alerted plaintiffs to the possibility that their land was contaminated even if plaintiffs had reason to think that the initial cleanup was successful. In particular, defendants cite (1) a 1993 news release from the Minnesota Department of Health, which stated that "[b]oth groundwater and soil *on and in the vicinity of the site* have been contaminated with polycyclic aromatic hydrocarbons (PAHs) and pentachlorophenol (PCP) due to past wood treating and waste disposal activities," Brodin Aff. Ex. 35 (emphasis added), and (2) publicity surrounding a proposed housing development on the Site, which was abandoned in 1994 due to concerns about contamination, Brodin Aff. Exs. 37, 38, 39. Although both the 1993 news release and the publicity surrounding the development are certainly evidence in defendants' favor, they do not justify the entry of summary judgment.

The 1993 news release does indeed mention contamination "on and in the vicinity of the site." It is not clear, however, to whom this news release was distributed. And even if it had been placed in the hands of every plaintiff, the statement cited by defendants would not necessarily put a reasonable homeowner on notice that his land had been contaminated. Homeowners do not read news releases with the care that, say, an attorney brings to reading a statute. The language relied on by defendants was a fragment of a sentence that appeared in a short background summary contained in the 1993 release — a summary that did not purport to be

based on any new information. The focus of the release was on potential health risks from *the Site*. Although the release made recommendations about restricting access to and cleaning up the Site, the release said nothing about health risks associated with land *near* the Site. The release fell short of giving plaintiffs clear notice that their properties might be contaminated, especially when considered in the context of the evidence described above.

The same can be said for the publicity surrounding the proposed housing development. The proposed development was slated for land that was formerly part of the Site itself,[7] and thus the fact that the possibility of contamination ultimately derailed the development did not provide notice that land near the Site might be contaminated. True, the publicity alerted residents to the possibility that the Site remained contaminated. But given the circumstances described above — including the fact that groundwater tests had found no contamination in city water and the fact that the MPCA had assured residents that they would not be affected by the contamination — evidence that the Site remained contaminated was not tantamount to evidence that land near the Site was contaminated.

Finally, defendants argue that, whatever else might be said, there are six plaintiffs who indisputably were on notice before 1999 that their properties were contaminated because these plaintiffs' properties were formerly part of the Site. In 1988, IP quitclaimed a portion of the Site to Cass Lake. Brodin Aff. Ex. 18 at 6. Between them, plaintiffs Donald Finn and Lois

---

[7]Although their brief is equivocal on this issue, plaintiffs asserted at oral argument that the proposed housing development was to be built on land that was formerly part of the Site. A 1994 article about the development stated that "Champion used to own the land Cepco wanted to develop. The land had once been part of Champion's hazardous waste site until Champion sold the property to the city, with MPCA approval." Brodin Aff. Ex. 37. In this context, of course, what is critical is not what was true, but what was *reported* as true. As best as the Court can tell, a Cass Lake resident who read about the failed development would have been led to believe that it was planned for the Site itself, as opposed to property near the Site.

Northbird, Dwayne and Wanda Muller, Iva LaDuke, and Blanca Duran purchased four parcels of this former Site land from the city. LaDuke Aff. ¶¶ 2-3; Finn Aff. ¶¶ 2-4; D. Muller Aff. ¶¶ 2-4; Duran Dep. 46-48. The quitclaim deed from IP, included in each parcel's chain of title, includes the following statement: "Grantor hereby represents and warrants that hazardous substances were located in or on the demised premises." Brodin Aff. Exs. 19-22. The quitclaim deed also creates a covenant prohibiting the installation of groundwater wells. Brodin Aff. Exs. 19-22. In addition, the chain of title for three of the four parcels includes an affidavit authored by James Carraway, IP's director of Environmental Projects. That affidavit warns that the groundwater underlying the parcels is contaminated with pentachlorophenol and other chemicals. Brodin Aff. Exs. 20-22.

As the Court stated earlier, there is overwhelming evidence that plaintiffs knew or should have known that IP had polluted the Site. The information in these six plaintiffs' chain of title is part of that evidence. But, as also stated earlier, there is evidence that the cleanup of the Site was regarded as a success by city residents, IP, and governmental agencies, and that both Donald Finn and the Mullers were specifically assured by city employees that their property was not contaminated. These plaintiffs do not dispute that they had actual or constructive knowledge of the fact that their *groundwater* was contaminated and that they could not sink wells. But they argue that, given the assurances by the city and the fact that the only restriction on their property involved the groundwater, they were justified in concluding that the *land* was otherwise safe for residential and commercial use.

In sum, the Court concludes that, although defendants have a respectable statute-of-limitations defense, the defense is not so strong that a reasonable jury must accept it. Defendants' motion for summary judgment is therefore denied.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that defendants' motion for summary judgment on the basis of the statute of limitations [Docket No. 402] is DENIED.

Dated: May 27, 2009      s/Patrick J. Schiltz
　　　　　　　　　　　　　　　　　Patrick J. Schiltz
　　　　　　　　　　　　　　　　　United States District Judge